**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **DENISE ADAMS HILL,** | |
| **Plaintiff,** | |
| v. | **Civil Action No. 19-3389 (JEB)** |
| **MERRICK GARLAND, *et al.*,** | |
| **Defendants.** | |

**MEMORANDUM OPINION**

Plaintiff Denise Adams Hill, a Black woman over the age of sixty, worked as a contract attorney at the Department of Justice for over two years. After being fired from that job in 2017, she brought this suit alleging a number of discriminatory actions by her DOJ supervisors in violation of Title VII and the Age Discrimination in Employment Act. Having successfully moved to dismiss many of those allegations, Defendants now seek summary judgment on what remains — namely, Plaintiff's claim that she was the victim of a discriminatory scheme to assign her fewer projects than her younger male counterparts and then to remove her for, in part, low productivity. In other words, she contends that she was miscast as the proverbial tortoise, when she was in fact the hare caged by lack of opportunity. Despite its narrative appeal, this story does not hold up under scrutiny. Because Hill has not established a genuine dispute of fact about whether she was systematically denied work or cast doubt on the agency's articulated legitimate, non-pretextual reasons for her termination, the Court will grant Defendants' Motion.

I.      **Background**

    A.   Factual Background

Because the Court is considering Defendants' Motion for Summary Judgment, it will construe the facts in the light most favorable to Plaintiff.  See Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011).

Hill can bring both Title VII and ADEA claims here because she is Black and is now 69 years old.  See ECF Nos. 59-4 (Defs. Statement of Undisputed Material Facts), ¶ 7; 64-1 (Pl. Opp.) at 3; 5 (Am. Compl.), ¶ 3.  In April 2015, she signed on to work as a contract attorney for Proxy Personnel — a subsidiary of STS Systems Integration, LLC — which had secured a contract to supply legal support staff to DOJ's Public Safety Officers' Benefits Office (PSOB). See Defs. SUMF, ¶ 8; ECF Nos. 59-10 (Defs. Excerpts of Denise Hill Dep.) at 40:15–24; 59-6 (STS-DOJ Contract); Am. Compl., ¶ 8.  In mid-2016, that contract was taken over by STS itself, which the Court, for convenience, will refer to throughout as the contracting employer.  See Defs. SUMF, ¶ 11.

Plaintiff received her compensation and benefits from STS.  Id., ¶¶ 12–13; ECF No. 59-13 (Paystub).  Her work assignments, on the other hand, came from PSOB, which also supplied her with training and the materials necessary to complete her work.  See ECF Nos. 64-2 (Pl. Statement of Material Facts in Dispute) at 2–3; 59-3 (MSJ) at 21; 69 (Defs. Reply) at 9; 59-17 (Dep. of Alvon Brown) at 39:25–40:7; 59-9 (Dep. of Felicia Wintz) at 17:22–25.  The parties offer differing accounts of how much involvement PSOB had in hiring and firing contract attorneys, setting their schedules, approving their leave, and providing performance evaluations. Compare Defs. SUMF, ¶¶ 8–9, 14–16 with Pl. SMFD at 1–5.  As the Court explains later on, this dispute is ultimately not relevant to the outcome.

PSOB is tasked with reviewing death and disability claims filed by public-safety officers injured in the line of duty.  See Defs. SUMF, ¶¶ 2–5.  As a contract attorney, Hill reviewed these claims at two stages of the process: (1) initial "scoring" reviews in which she identified legal issues of concern prior to the Benefits Program Office Director's written determination of the claim; and (2) reviews of those written determinations for legal sufficiency.  See id., ¶ 3; ECF No. 59-7 (Defs. Excerpts of Michael Daugherty Dep.) at 22:5–23:12.  Hill worked alongside two other contract attorneys on the "office-level" review team, with additional lawyers staffed on later stages of the review and appeal process.  See Defs. SUMF, ¶¶ 6, 17.  Plaintiff was the only office-level contract attorney over the age of 40 as well as the only woman; William Dunlap was a white man in his late 30s and William Pope, who started at PSOB after Hill, was a Black man in his early 30s.  Id., ¶ 17.  Both Dunlap and Pope had less legal experience than Hill.  See ECF No. 59-16 (Attorney-Seniority Email).

A few other figures fill out the cast of relevant characters.  Michael Daugherty, PSOB's legal counsel, was "responsible for the legal review of all claims for benefits in the Public Safety Officers' Benefits Program."  Defs. Ex. of Daugherty Dep. at 9:16–10:4.  Barbara Gilmore was a lower-level PSOB attorney who participated in supervising the contract attorneys' workflow. See ECF Nos. 59-29 (Claims-Scoring Email); 59-8 (Defs. Excerpts of Barbara Gilmore Dep.); 64-14 (Pl. Excerpts of Barbara Gilmore Dep.) at 17:20–18:2.  Alvon Brown was a paralegal whose duties included recommending how to assign claims amongst the contract attorneys and tracking the status of claims once assigned.  See Defs. SUMF, ¶ 18; Pl. SMDF at 2–3; Brown Dep. at 23:18–24:4, 40:19–41:10; ECF No. 64-10 (Dep. of William Pope) at 18:8–13.  Felicia Wintz and Eileen Garry were, at different times during Hill's tenure, the DOJ Contracting Officer Representatives (COR) who coordinated on administrative matters with contractors like

3

STS.  See Wintz Dep. at 13:13–17, 16:24–17:12.  Finally, Raul Quintana was a program manager at STS who managed the contract attorneys for the company.  See ECF No. 59-34 (Quintana Email); Pope Dep. at 14:10–13.

Plaintiff's first clue that something was amiss at PSOB was her struggle to get enough work assignments.  In early 2017, she noticed that the office-level attorneys were beginning to run out of claims to review.  See ECF No. 64-11 (Pl. Excerpts of Denise Hill Dep.) at 87:18–20.  She began asking for additional work regularly, but her coffers remained spare.  Id. at 88:1–3, 91:10–13.  Indeed, during this period, all three contract attorneys informed their higher-ups that they had very few claims to work on.  See Defs. Ex. of Hill Dep. at 43:2–7.  While the decline in claims affected all of the attorneys, Hill came to believe that the scarcity was worst for her.  See Pl. Ex. of Hill Dep. at 87:12–14, 89:14–19, 91:10–23.  In May 2017, two of Plaintiff's cases were reassigned from her to the other attorneys, whose inventories were "super low," even though she advised that she, too, would run out of work soon.  See ECF No. 64-18 (Reassignment Email).  The next month, unlike her colleagues, she was not affirmatively approached to work on appeals as a way of augmenting her caseload.  See Pope Dep. at 30:15–17; Defs. Ex. of Hill Dep. at 88:15–90:10; Pl. SMDF at 7–8.  In Hill's view, these incidents revealed a scheme to "make her appear unproductive compared to her colleagues."  Pl. SMDF at 7.

Plaintiff nevertheless did not receive any negative feedback from her PSOB supervisors.  Behind the scenes, however, Daugherty and Gilmore had been venting their frustrations with Hill since October 2016.  In a performance memorandum addressed to COR Garry, Daugherty identified several problems with her work and requested that "this information be provided to the contractor for action as appropriate."  ECF Nos. 59-25 (Perf. Memo) at 369; see also 59-26 (Oct.

4

2016 Email to Garry) (indicating that "the Project Manager must address" the performance issues with Hill).  Chiefly, Daugherty objected to Plaintiff's output, which lagged dramatically behind "STS attorneys performing similar work."  Perf. Memo at 370.  Taking September 2016 as an example, he noted that Hill had completed just 19 reviews, a paltry number when placed against another attorney's 40 reviews.  Id.  Over the entirety of fiscal year 2016, she produced only 228 reviews while a "similarly situated, but less experienced, contract attorney" managed to produce 298.  Id.  Productivity was not Plaintiff's only shortcoming; according to Daugherty, she also lacked case-management skills, struggled to complete assignments in a timely way, had been observed surfing the web during work hours, and consistently arrived to work at least 30 minutes late.  Id.

Hill's performance evidently continued in this vein, eventually prompting more decisive action on PSOB's part in September 2017, when they removed her from the contract.  See ECF No. 59-33 (Removal-Justification Email).  Daugherty provided COR Wintz a list of talking points explaining the decision in advance of Plaintiff's termination, many of which are repeats of the issues he had documented in October 2016.  Id.  Again, Hill's output was "substantially less than other legal advisors."  Id.  As evidence of the productivity issue, Daugherty relied on a chart showing how many claims each contract attorney had completed between April 1 and July 21, 2017.  See ECF No. 59-28 (Claims-Completion Chart).  This data was compiled using each attorney's own "statement of deliverables," documents they began providing to PSOB staff each month for claims-tracking purposes in 2017.  See ECF Nos. 64-21 (Claims-Completion Chart Email) (cover email stating that the "data comes from the [contract attorneys'] monthly SOD and was verified by [Gilmore's] records"); 59-19 (Reporting Memo) (explaining newly implemented tracking requirements).  Beyond productivity, Daugherty wrote that Plaintiff's work had

prompted complaints regarding the "substance and timeliness of advice," that she "[d]id not consistently follow instructions as to office procedures," and that she showed an inability "to track and maintain accountability [for] claims files" as demonstrated when a missing claim was found in her possession "<u>months</u> after all staff were directed to" search for it.  <u>See</u> Removal-Justification Email.

Despite Daugherty's 2016 request for STS to provide Hill with feedback, she seemingly was not made aware of PSOB's concerns until September 21, 2017, when Quintana informed her at PSOB's behest that she would be removed from the contract.  <u>See</u> Quintana Email (communicating plan to meet with Hill on that date); Pl. Ex. of Hill Dep. at 23:19–21, 55:9–56:15.  Quintana was instructed to relay to Plaintiff that "the overall issue" with her work was "productivity (quality and quantity)."  ECF No. 64-23 (Termination-Communication Email).  Because she had not met "customer and contractual requirements," STS quickly let Hill go as well.  <u>See</u> ECF No. 59-35 (STS Termination Letter) (stating her final day would be October 1, 2017).  According to Plaintiff, shortly after her last day at PSOB, the remaining contract attorneys received approximately 30 new claims each.  <u>See</u> Pl. SMDF at 8.

Following her termination, Hill filed a formal Equal Employment Opportunity complaint, commencing an administrative process that culminated in an adverse Final Agency Decision from DOJ.  <u>See</u> ECF No. 59-37 (Agency Adjudication).  She then brought this action on November 8, 2019, against various government Defendants, asserting Title VII and ADEA claims for age, race, and sex discrimination.  <u>See</u> ECF No. 1 (Compl.), ¶¶ 52–56.  After she amended her Complaint, Government Defendants moved to dismiss, citing administrative exhaustion and merits deficiencies.  <u>See</u> ECF No. 15 (MTD).  The Court granted that Motion to Dismiss in part nearly three years ago, <u>see</u> <u>Hill v. Garland</u>, 2021 WL 965624, at *3–5 (D.D.C.

Mar. 15, 2021), but denied it as to Hill's "discrimination claims . . . pertaining to her alleged reduction in workload and termination." Id. at *9. Like its protagonist (at least as Defendants would have it), this case moved with somewhat less than optimal speed thereafter: the parties sought extensions to continue discovery no fewer than seven times. See ECF Nos. 40, 41, 44, 45, 47, 48, 49. Finally bringing that protracted period to an end, Defendants have now moved for summary judgment on Hill's remaining claims.

## II.    Legal Standard

Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Liberty Lobby, 477 U.S. at 248 (cleaned up); see also Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998). The court must "eschew making credibility

determinations or weighing the evidence."  Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir.

2007).  The non-moving party's opposition, however, must consist of more than mere

unsupported allegations or denials and must be supported by affidavits, declarations, or other

competent evidence, setting forth specific facts showing that there is a genuine issue for trial.

See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The non-movant,

in other words, is required to provide evidence that would permit a reasonable jury to find in his

favor.  See Laningham v. U.S. Navy, 813 F.2d 1236, 1242–43 (D.C. Cir. 1987).

### III.   Analysis

In vying for summary judgment, Defendants advance three arguments: (1) Hill cannot lay

claim to the ADEA or Title VII's protections because she was an independent contractor whose

sole employer was STS; (2) in any event, she cannot make out a *prima facie* case of

discrimination based on the reduction in her workload because she was never given materially

less work than the other contract attorneys as she claims; and (3) she similarly cannot prove

discrimination based on her reassignment from the PSOB contract because it occurred for

legitimate, non-discriminatory reasons.  Whether Plaintiff was a contractor or a joint employee is

a close and interesting question.  Because the Court is persuaded by Defendants' last two

contentions, however, it need not delve into that issue.

### A.  Legal Framework

Title VII makes it unlawful for an employer to "discriminate against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The

Supreme Court established the three-part burden-shifting framework that governs traditional

claims of employment discrimination in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–

05 (1973).  Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  In keeping with "the Supreme Court's emphasis on flexibility" in this area, our Circuit has adopted a "general version of the prima facie case requirement: the plaintiff must establish that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." Chappell-Johnson v. Powell, 440 F.3d 484, 488 (D.C. Cir. 2006) (cleaned up).

After a plaintiff makes that preliminary showing, "'[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason' for its action.  If the employer succeeds, then the plaintiff must 'be afforded a fair opportunity to show that [the employer's] stated reason . . . was in fact pretext' for unlawful discrimination." Id. at 487 (quoting McDonnell Douglas, 411 U.S. at 802, 804) (internal citations omitted).

When, however, "an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not — and should not — decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas." Brady v. Off. of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis omitted).  The court's task in such cases is to "resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" Id.  The "relevant inquiry" is thus whether an employee has "produced sufficient evidence for a reasonable jury to conclude that the [defendant's] asserted nondiscriminatory reason for firing h[im] was not the actual reason, and that instead the [defendant] was intentionally discriminating." Wheeler v. Georgetown Univ. Hosp., 812 F.3d 1109, 1114 (D.C. Cir. 2016).

The foregoing framework applies to ADEA claims as well.  Hall v. Giant Food, Inc., 175 F.3d 1074, 1077 (D.C. Cir. 1999).

B.  Reduction in Workload

Hill first submits that her PSOB supervisors intentionally assigned her less work than her fellow office-level attorneys "to create the impression that she did not complete work at the same productivity level of her colleagues."  Pl. Opp. at 27.  The scheme to deny her work, Hill says, is cognizable as its own adverse employment action "because it led to an objectively tangible harm: her termination."  Id. at 26 (citing Brownfield v. Bair, 541 F. Supp. 2d 35, 45 (D.D.C. 2008)). Of course, the D.C. Circuit recently held that Title VII includes no such tangible harm requirement, so, as the law currently stands, she need not go that far to prevail.  See Chambers v. District of Columbia, 35 F.4th 870, 872, 873–75 (D.C. Cir. 2022) (holding that only question is whether employer's action affected employee's "terms, conditions, or privileges of employment").  This very question is currently pending before the Supreme Court.  See Muldrow v. City of St. Louis, 143 S. Ct. 2686 (2023) (granting certiorari to decide whether employer's action must cause employee "significant disadvantage" to support Title VII claim).  In any event, even employing the more demanding pre-Chambers standard, the Court has no trouble concluding that if Hill was in fact assigned materially less work — and that this factored into her removal — then she has established that she suffered an adverse action.  See Morales v. Gotbaum, 42 F. Supp. 3d 175, 190 (D.D.C. 2014) ("Courts have previously found objectively tangible harms where the adverse action results in a 'significant change in employment status, such as . . . firing . . . .'") (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)); Douglas v. Donovan, 559 F.3d 549, 553 (D.C. Cir. 2009) (explaining that while "the effect of a poor evaluation is ordinarily too speculative to be actionable," if "that evaluation determines the

bonus[,] . . . then the employee may show the evaluation caused an objectively tangible harm")

(internal citations omitted).

Factual proof of her work-reduction claim, however, proves itself to be a tough customer

for Hill.  Defendants insist that "Plaintiff has not presented any evidence other than mere

speculation that she was actually assigned fewer cases than her co-workers such that they were

not receiving cases on a roughly equal basis."  Reply at 12; see also MSJ at 30.  The Court agrees

that Hill's evidence of unequal assignments is easily parried and thus does not create a genuine

dispute of fact.

Start with Plaintiff's assertion that she sometimes ran out of work and had to ask for

more, unlike her colleagues.  See Pl. Opp. at 41.  The parties agree that the number of incoming

claims for office-level attorneys would ebb and flow such that at times, there was an overall

shortage of work.  See Defs. SUMF, ¶¶ 26–28; Pl. SMDF at 6.  Those droughts did not affect

Plaintiff alone.  Still, she points to Pope's testimony that, generally speaking, Brown kept him

"pretty stacked with work," as support for her theory that slowdowns affected her more than

others.  See Pl. Opp. at 27, 41 (citing Pope Dep. at 19:21–20:4).  But that broad statement does

not imply that Pope never experienced shortages of work.  Indeed, Plaintiff herself testified that

he did.  See Defs. Ex. of Hill Dep. at 43:2–7 (describing occasion on which "[a]ll of the contract

attorneys got together and had a meeting about" fact that they "were being given no work and

were out of work day-to-day"); see also Reassignment Email (May 2017 email noting that

Dunlap and Pope had very low inventory); ECF Nos. 59-21 (First Workload Email) (July 2017

email recalling that recently "Legal Advisors expressed concern regarding their workload"); 59-

22 (Second Workload Email) (September 2017 email stating, "Will Pope just finished his last

claim this afternoon.  Will Dunlap and Denise Hill only have one claim each . . . .  No additional claims were delivered today . . . .").

Hill next maintains that Defendants "withheld cases for distribution until after [her] termination in order to create the impression that she was a poor performer in comparison to her colleagues."  Pl. Opp. at 35.  Specifically, she believes that shortly after her termination, Dunlap and Pope suddenly received 30 cases apiece.  Id.  Setting aside that such a withholding strategy would seem to affect all of the contract attorneys — not just Hill — there is no admissible evidence in the record suggesting that it is true.  Plaintiff cites only her own administrative complaint, in which she states that "another contract attorney advised" her that "the two remaining initial review attorneys each received 30 cases" just days after her departure.  See Pl. Opp. at 35 (citing ECF No. 64-19 (EEO Compl.), ¶ 24).  Defendants correctly argue that this evidence is classic hearsay and is therefore inadmissible at summary judgment.  See Defs. Reply at 9; Talavera v. Shah, 638 F.3d 303, 310 (D.C. Cir. 2011) (statement by plaintiff's colleague about employer's hiring practices inadmissible hearsay in absence of "evidence that these statements were within the scope of [colleague's] employment or that he was given authority to speak on behalf of the [employer] on the subject"); Greer v. Paulson, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (such hearsay "counts for nothing" at summary judgment) (citation omitted).

In addition to the withholding scheme, Plaintiff points to two other occasions on which she was supposedly shorted work outright: (1) when two of her cases were reassigned from her to Dunlap and Pope and were not replaced, see Reassignment Email; and (2) when she was not offered the opportunity to boost her caseload by working on appeal reviews until she asked affirmatively, unlike comparators.  See Pope Dep. at 30:15–17 (recalling that he was approached

for appeals training); Defs. Ex. of Hill Dep. at 88:15–90:10 (testifying that there seemed to be no

plan to train her on appeals before she asked); Pl. Opp. at 27–29.

Neither occurrence evinces a systematic attempt to undermine Hill's productivity metrics.

Between April 1 and July 21, 2017, Defendant's records show that Hill completed 54 office-level

claims in comparison to Dunlap's 100 and Pope's 96 claims.  See Claims-Completion Chart.  In

addition, Hill completed three appeals, Dunlap completed four, and Pope completed six.  Id.  The

reassignment of two cases and an inability to work on just a few appeals would be a drop in the

sizable bucket that was the disparity between Hill's and her colleagues' numbers.  Not to

mention that Hill was not prevented from working on appeals, but merely not initially

approached about it.  These incidents, therefore, do not show a plot to deny Hill work at a clip

that could possibly justify her termination.

Finally, Plaintiff's contention that she simply received less work in the normal course is

also lacking.  Her theory here is that she completed fewer claims than her counterparts only

because she "was not assigned as many work assignments."  Pl. Opp. at 29.  There are several

problems with this line of argument.  First, Hill improperly inverts the burden by faulting

Defendants for "fail[ing] to provide any evidence demonstrating that she was assigned as many

work assignments as her colleagues."  Id.  The unequal assignment of work is a key component

of Plaintiff's *prima facie* case, not a dispute over a legitimate business reason for denying her

work.  Under the McDonnell Douglas framework, showing a material dispute of fact on the

*prima facie* case remains the plaintiff's task even at summary judgment.  Iweala v. Operational

Techs. Servs., Inc., 634 F. Supp. 2d 73, 81 (D.D.C. 2009) (citing McDonnell Douglas, 411 U.S.

at 802).

In fact, Hill's observation that the record contains no accounting of Dunlap's and Pope's assignments is a concession that, just as Defendants cannot show the absence of a disparity, she cannot prove the presence of one.  She places heavy weight on Daugherty's admission that she could have completed only the assignments she was given, see ECF No. 64-8 (Pl. Excerpts of Michael Daugherty Dep.) at 98:10–15, and that her so-called "statement of deliverables" shows that she mostly did complete her assignments.  See Pl. Opp. at 29–31; ECF No. 64-22 (Statements of Deliverables) at 1180 (comparing number of "cases for each of the undertaken tasks" to number of "tasks completed").  But, as she concedes (or, more accurately, trumpets), there is no list of Dunlap and Pope's assignments in the record to compare her list of assignments to.  See Pl. Opp. at 29.

Even a resort to proxy figures (a method Hill does not herself urge the Court to employ) would not win the day for Plaintiff.  The claims-completion data — which is available in full for only April through June 2017 — is the best indication of how many claims Hill's comparators were assigned.  See Pope Dep. at 29:3–5 (agreeing that he generally "complete[d] the amount of assignments [he was] given"); Claim-Completion Chart (documenting those months in full, but only part of July 2017's data).  Comparing Hill's assignments, as documented in her statement of deliverables, to that data does not show that she was assigned significantly fewer claims than either Dunlap or Pope.  It shows that, per month, Hill was assigned just three or four fewer claims than her closest comparator.  Compare Statement of Deliverables at 1168, 1172, 1176 (showing Hill was assigned 58 claims between April and June 2017), with Claims-Completion Chart (showing that in same time period, Dunlap and Pope completed 69 and 72 claims respectively).  By contrast, taking into account all of the claims-completion data, Hill finished an average of 10 fewer claims per month than her comparators.  See Claims-Completion Chart.

This, too, ultimately amounts to an attempt to fashion mountains from molehills; no jury could infer a conspiracy to keep work out of Hill's hands as a way of justifying her later termination from this minor difference.

It bears mention, moreover, that the record supplies an explanation for why Plaintiff may have received slightly fewer assignments. The unrebutted evidence shows that claims were at times assigned to the office-review attorneys with an eye to their preexisting caseloads. As a refresher, Paralegal Alvon Brown was in charge of facilitating the assignment of claims. See Pope Dep. at 18:8–14. He kept a spreadsheet detailing when a claim was sent to an attorney and when he received it back, giving him a rough sense of attorney caseloads. See Brown Dep. at 23:18–24:4. His practice was to recommend to Daugherty that incoming claims be assigned to attorneys who had fewer outstanding claims according to his spreadsheet. Id. at 40:19–41:10. Daugherty did not always follow Brown's recommendation, id., but the starting point for assignment was distribution based on workload. See also ECF No. 59-31 (Hill-Performance Talking Points) (Gilmore reporting that Hill's "lack of a current inventory [list] makes it difficult . . . to confirm [her] workload in order to assign and distribute work evenly among all contract attorneys"). Assignment numbers thus would have varied according to how quickly each contract attorney moved through his inventory of claims. On at least one occasion, Hill was significantly behind on her claims and had not produced any deliverables for an entire week, prompting Gilmore to wonder "what she is doing all day." ECF No. 59-30 (Late-Assignments Email) (documenting backlog of nine overdue scoring claims). In light of this explanation for any minor variance in assignments, no reasonable jury could conclude that some clandestine plan to deprive her of work was at play.

In sum, the record is devoid of evidence from which a reasonable factfinder could infer that assignments were doled out with the aim of deflating Hill's productivity.  At most, a jury could infer a minor difference in workloads, and even that difference has only one readily available (and innocent) explanation based on the evidence.  Since a factfinder could not conclude that this first adverse action occurred, the denial-of-work claim cannot survive.

C.  Termination

Next, Hill submits that her reassignment from the PSOB contract, which ultimately resulted in her termination from STS, see Termination Email (ending Hill's employment for "not meeting customer and contractual requirements"), was the product of discrimination.  Instead of assailing her attempt to show an adverse action, this time Defendants counter with a slew of nondiscriminatory explanations for their decision to reassign Hill.  Specifically, they identify three reasons why her work was not up to snuff: (1) "her claims file review and scoring rate was only about half of the other two office-level contract attorney[s]"; (2) her "internal organizational skills" were lackluster; and (3) her attendance was "below expectations."  MSJ at 31–32.

There is no genuine dispute about whether Hill's performance was an ongoing topic of concern at PSOB.  Daugherty first raised complaints in October 2016.  See Perf. Memo.  Those complaints were quite similar to the ones ultimately cited in removing Plaintiff from the contract.  Compare id. with Removal-Justification Email.  And, along the way, internal communications corroborate the existence of ongoing issues with her tardiness and organization.  See Reassignment Email (noting Hill's failure to update inventory); Late-Assignments Email (listing nine overdue scoring claims).  The consistency of these documented issues is strongly corroborative of Hill's performance problems.  Cf. Kalinoski v. Gutierrez, 435 F. Supp. 2d 55,

68 (D.D.C. 2006) ("[E]vidence of alternate justifications tends to undercut the proffered explanation . . . .").

To survive summary judgment, Hill must "produce[] sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason" for the adverse action, and that the actual reason was race, age, or gender discrimination.  Brady, 520 F.3d at 495.  The Court takes her attempts to do so for each of Defendants' performance-based rationales in turn.

### 1. *Low Productivity*

Begin with Hill's comparatively low rates of claim completion.  Recall that Daugherty documented this issue as early as October 2016, when he observed that she had completed only 19 claims in September 2016, fewer than half of another attorney's 40 claims.  See Perf. Memo. Over the entirety of fiscal year 2016, she completed 70 fewer reviews than another attorney.  Id. That trend continued in the spring and summer of 2017, when Hill apparently churned out just 56 claims, again nearly half that of the other attorneys.  See Claims-Completion Chart.

Plaintiff first elides the productivity issue by asserting that because she generally completed the claims she was assigned, her output could not have caused any grief.  See Pl. Opp. at 29–31; see also id. at 38–40 (arguing that no quota or time limitations for claims completion existed, and thus she did not fail to meet any such requirements).  Even taking that contention as true, it is a sidestep that fails to persuade because Defendants' stated concern had to do with Hill's relative productivity.  See MSJ at 31 (citing "concern[s] about Plaintiff's reduced productivity compared to the other two office-level contract attorneys").  Hill's myopic observations that she completed most of her assignments and did not run afoul of any claims quotas or timing requirements are entirely irrelevant to that yardstick.

17

Plaintiff's next avenue of rebuttal is to call into question the accuracy of the claims-completion data itself.  The first strike against her is that she offers no basis for attacking the validity of the 2016 data.  See Pl. Opp. at 31–35.  As for the 2017 figures, she takes issue with a few inconsistencies between her statements of deliverables and the claims-completion chart, arguing that because the latter was purportedly based on the former, they should match.  Id.  True enough, some discrepancies are apparent.  The most striking of these is an undercount of claims in May 2017, where the chart reports that she only completed ten scoring claims, one disability claim, and five death claims, while her statement indicates that she produced eighteen scoring, two disability, and six death claims.  Compare Statement of Deliverables at 1168 with Claims-Completion Chart.  The others are less impressive: an undercount of one disability claim in April 2017, another disability claim and two death claims in June 2017, and an overcount of six scoring claims in June 2017.  Compare Statement of Deliverables at 1172, 1176 with Claims-Completion Chart; see also Pl. Opp. at 32–33.  Any inconsistencies between the documents in July 2017, moreover, are less than telling, as the claims-completion chart only runs through July 21, whereas the statement of deliverables reports on the full month.  Compare Statement of Deliverables at 1180 with Claims-Completion Chart.  The Court therefore does not consider them.

Rather than chalking these inconsistencies up to error or miscommunication — which Defendants argue is likely because her statement of deliverables contains problems like duplicate entries, see Defs. Reply at 11 — Hill concludes that the claims-completion chart is a "wholly inaccurate and unreliable" contrivance.  See Pl. Opp. at 33.  Her flyspecking, however, does not raise such an inference.  In all, Plaintiff has ferreted out an undercount of her completed claims of just eight, bringing the 42- and 46-claim disparities between her and her colleagues down to

18

just 34 and 38, respectively.  Because even these gaps are more than significant enough to justify

performance concerns, any data mismatch does not establish a triable question as to her

productivity.

Plaintiff fares no better in suggesting that PSOB management failed to account for the

varying complexity of claims when comparing her and her colleagues' numbers.  While true that

disability claims generally took longer to complete, and scoring claims were often simpler to

accomplish, see Pl. Ex. of Daugherty Dep. at 70:21-71:3, 113:3–5, Plaintiff's contention that this

explains her productivity deficiency is pure speculation.  See Pl. Opp. at 33 (stating without

supporting evidence that "it is completely likely that Plaintiff had been assigned more disability

claims than her comparators").  What is more, it is speculation that the record clearly refutes,

even accepting that Hill's statement of deliverables reflects the true count of her completed

claims.  See Claims-Completion Chart (Dunlap completed five disability claims and Pope

completed twelve between April and June 2017); Statement of Deliverables at 1168, 1172, 1176

(Hill completed five in same period).

Next up is Plaintiff's contention that because Daugherty could not name which attorney

her 2016 data was compared to during his deposition, see Pl. Ex. of Daugherty Dep. at 95:13–

96:17, he was not necessarily comparing her to an "attorney[] who worked on office-level claims

like Plaintiff."  Pl. Opp. at 34.  In so arguing, Hill ignores that the 2016 performance memo

states that the comparison was between Hill and "colleagues performing the same work."  Perf.

Memo at 370.  Because she offers no evidence that this contemporaneous statement was

incorrect, her charge of an apples-to-oranges comparison falls flat.

Plaintiff rounds out her losing streak by suggesting that, generally speaking, she met

performance expectations by "perform[ing] her work thoroughly" and "solv[ing] issues not often

19

solved by her colleagues due to the level of detail she put into her work."  Pl. Opp. at 36.  She adds, relatedly, that she was never given a poor performance evaluation, "instructed to stop" reviewing claims at this level of detail, or otherwise "told she was underperforming."  Id.  Accepting that Hill's work product was adequate — or even superior — does not make it any less true that her productivity was problematic.  See Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 528 (3rd Cir. 1992) ("Pretext is not established by virtue of the fact that an employee has received some favorable comments in some categories . . . .").  And although she received no feedback or direction to speed up, her PSOB supervisors raised concerns about her output long before she was terminated, dispelling any inference of a sudden, pretextual attack on her pace.  See Perf. Memo.  Plaintiff, finally, presses no claim that PSOB violated procedure by communicating feedback to the COR rather than to her directly.  See Walker v. Johnson, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (listing "deviation[s] from established procedures" as possible basis for inference of pretext); cf. Atkinson v. Denton Pub. Co., 84 F.3d 144, 149 (5th Cir. 1996) (finding summary judgment inappropriate where employee terminated for job performance "was never given any negative performance evaluations or warnings about his performance, although it was the company's policy to do so before termination").  Her quarrel on this score is thus with STS — a nonparty — for not acquiring and conveying PSOB's feedback; no jury could attribute pretext to PSOB based on STS's neglect to do so.

2. *Organization*

Defendants are on similarly firm ground in stating that Hill demonstrated difficulty in keeping her work organized and following internal procedures.  First, emails show that she often did not save her work product correctly, causing others trouble as they looked for it.  See Claims-Scoring Email at 397 (email traffic demonstrating confusion about completion status of claims

because Plaintiff was "still struggling with the following the procedures" for uploading her work); see also Defs. Ex. of Daugherty Dep. at 28:11–17, 29:8–30:10 (recalling conversation about this issue); Late-Assignments Email at 321–22 (noting that Hill stated she completed certain legal reviews without providing the corresponding work product); Performance Talking Points (similar).  In addition, she displayed "poor case tracking and management" skills, which "hinder[ed] [PSOB staff's] ability to conduct oversight and review of claims files."  MSJ at 32; see Reassignment Email at 939 (Hill was unaware of two claims assigned to her); Performance Talking Points at 312 (citing "lack of a current inventory" as problematic for assigning new claims equitably).

Hill's sole response to the foregoing is that there was not, in fact, any requirement for contract attorneys to track their own inventory.  See Pl. Opp. at 37.  Pope and Gilmore knew of no obligation to keep a written record of inventory, and Brown also tracked the claims, obviating the need for contract attorneys to do the same.  See Pope Dep. at 29:13–15; Pl. Ex. of Gilmore Dep. at 28:12–29:18, 77:16–20.  This is yet another dodge (and a half dodge at that, as it is responsive to only one of the stated concerns).  Defendants' charge is not that Plaintiff failed to fulfill some formal tracking requirement or keep any particular document up to date, but that her inability to give current information about the status of her inventory when requested caused problems for the rest of her team.  See Reassignment Email.  No reasonable juror would detect pretext in PSOB's desire to avoid employees' wasting their time looking for Hill's work product and informational gaps hampering the assignment of new claims.

3. *Attendance*

Defendants' final stated rationale for removing Hill from the PSOB contract was her attendance.  Indeed, she arrived late to work with impressive consistency.  She was scheduled to

work in person from 8:00 a.m. to 4:30 p.m. four days a week, and remotely from 7:00 a.m. to

3:30 p.m. once per week.  See ECF No. 59-27 (Entry Data) at 373.  The data showing when she

entered the building indicates that, for a two-month stretch in 2016, she never arrived in person

before 8:28 a.m.  Id. at 372.  In fact, it was not uncommon for her to arrive almost an hour late

without communicating the reason for her tardiness.  Id. (showing unexplained arrival times of

8:54 a.m. on Aug. 31, 8:54 a.m. on Sept. 20, 8:49 a.m. on Sept. 23, 8:50 a.m. on Sept. 27, and

8:52 a.m. on Sept. 30).  The timestamps of her logins on telework days were no better: while she

did sometimes log on as early as 7:11 a.m., she more often than not logged on after 8:25 a.m.,

with 10:15 a.m. as her latest.  Id. at 381.  Hill rejoins that "she was able to perform work even

when logged out," but provides no evidence in support, which is not enough to create a jury

question on her working hours.  See Pl. Opp. at 38.

Plaintiff's chief complaint about this critique is that she was singled out for scrutiny.

That may be true, but it carries little weight because she does not identify any evidence that her

comparators warranted such scrutiny.  See Pl. Opp. at 38, 41; see also Pope Dep. at 16:12–16

(stating that he always arrived to work on time); Defs. Ex. of Daugherty Dep. at 166:9–10

(testifying that neither Pope nor Dunlap had attendance issues).  Hill's only suggestion to that

effect is that Daugherty failed to scrutinize the login times of one other contract attorney who he

knew had attendance problems.  See Pl. Opp. at 38 (citing Pl. Ex. of Daugherty Dep. at 143:19–

144:1, 145:15–19).  This is a red herring: as Defendants correctly note, that attorney — Bryan

Dunning — was let go because of these attendance problems, so he clearly did not receive more

favorable treatment in comparison to Hill.  See Pl. Ex. of Daugherty Dep. at 145:19–146:5; Defs.

Reply at 15.

Nor was Daugherty's justification for reviewing Plaintiff's attendance data insufficient. Daugherty testified that he thought to look at that data because "when I would walk by the cubes to see who was in their work stations[,] Ms. Hill would not be there." Pl. Ex. of Daugherty Dep. at 144:2–6; see also id. at 144:16–18. Others noticed the same. Id. at 144:18–145:6. Missing the point, Hill counters that he should have "consider[ed] [the possibility] that she was in the office but merely away from her desk." Pl. Opp. at 38. Yet, of course, such was not the case at arrival time, as the timestamps indicate. In any event, it is entirely reasonable to question an employee's attendance habits based on her demonstrated tendency to wander from her desk during the workday, even if she remains in the building.

*     *     *

Finally, in a last-ditch effort to show pretext, Hill turns to examining how her removal was carried out. She finds suspicious a PSOB email directing her STS supervisor to communicate the decision in generalities. See Pl. Opp. at 43–44 (citing Termination-Communication Email) ("Specifics aren't necessary (especially not in writing) but the overall issue is productivity (quality and quantity)."). This email raises an inference of pretext, she maintains, because it shows Defendants' unwillingness to communicate the bases for removal and to commit them to writing. Id. at 44. Not so. The email does not show hesitation to explain Defendants' rationale for removal, only a preference to avoid the ins and outs of Hill's performance, a perfectly legitimate choice that does not bespeak pretext. See Steele v. City of Bluffton, 31 F. Supp. 2d 1084, 1096 (N.D. Ind. 1998) ("An employer need not inform an employee of all possible reasons it may have for terminating an employee."); Chu v. Samuel Geltman & Co., 1993 WL 492747, at *6 (E.D. Pa. 1993) ("[A]n employer [is not] prohibited from sparing the employee the possible hurt that may be caused by its view of the employee's

23

work quality."); cf. Royal Dev. Co. v. NLRB, 703 F.2d 363, 372 (9th Cir. 1983) (explaining that wholesale "failure to mention to an employee an asserted reason for adverse action at the time the action is taken can indicate a discriminatory motive for the discharge").  And the detailed documentation of Hill's performance problems elsewhere dispels the notion that Defendants were reluctant to put their reasoning in writing.  See Perf. Memo; Removal-Justification Email; Performance Talking Points.  Hill's last attempt thus does not demonstrate a genuine dispute of fact on pretext.

Because no jury could find that Defendants' reasons for removing Hill were trumped up, and because Plaintiff offers no other convincing evidence of pretext, her claim of discriminatory termination does not survive summary judgment.

## IV.  Conclusion

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  February 9, 2024